Number 22-32-20 United States v. Kissi Good morning, your honors. May it please the court, I'm Lucas Anderson, here for the appellant Cedric Kissi. I first want to note one fact that's changed since my latest filing with this court. As of this morning, the Bureau of Prisons website indicates that Kissi's current projected release date is April 1 of 2025, a little more than 13 and a half months away. Turning to the money laundering conspiracy, our challenge to the sufficiency of the evidences account to is grounded in three separate arguments, any one of which is enough for a reversal. First, there was no evidence of an agreement to conduct financial transactions whose design was to conceal an attribute of the money. And even if there was, and this is our second argument, there's no indication that Kissi himself was ever aware of such a design. And third, there's nothing in the record from which it can be properly inferred that Kissi knew or consciously avoided the fact that the money he transmitted for other people represented the proceeds of some other felony separate and apart from the transactions themselves. And that third argument also forms the basis of our challenges to counts three and four. With respect to the design to conceal element under section 1956, the government laid it out perfectly at the beginning of their opening brief. They said that Kissi's job was to move stolen money around so that it could be sent abroad. And then through the direct examination testimony of their cooperating witness and the testimony of one of the victims they called to testify, they set about proving that the transactions were designed to get money from the scam perpetrators, I'm sorry, from the victims of the United States to the scam perpetrators in Africa. And I think it's clear from the record that neither the government nor the district court or Kissi's trial counsel below appreciated exactly what's required under the section 1956 design to conceal element. It's a very specific thing, but the Supreme Court in 2008 and this court and multiple binding opinions since then has made it clear that a design to conceal isn't just an intention or an attempt to hide money while it's being moved from one location to the other, whether that's through the physical transportation of currency or whether it involves banks as it did in Eibar Pueblo. What the element requires is proof of financial transactions whose purpose was to obscure something about the money. So the question they have to answer in this case is why was money being moved from the United States to Africa? Well, I mean, isn't there a slightly broader question which is why it was passed through Kissi's account in the first place? In other words, once it's in his account, yes, it's going to move to the scam perpetrator's accounts at some point. But if the question is why have a middleman, and the answer is because if you don't conceal where the money is going by having an account in the U.S. to send it to, nobody's going to fall for the scam. Nobody's going to deposit money in a Ghanaian bank. So isn't the concealment sort of implicit in the arrangement before he even gets the money? No, Your Honor. First of all, everybody who's involved in these transactions, including the victims who testified, expected that Kissi would be acting as a conduit for the money to get abroad. The government brought up one of the victims, Milton Duffield, and they asked him specifically, how did these fraud perpetrators try to get money from you? And he said, first, they asked me to send it to them directly, wiring it internationally. And then he went to his credit union, and they said, we don't have a code to do international wiring. And so he went to the scam perpetrators and said, my bank can't do it. And they said, OK, well, in that circumstance, then why don't you send this money to this person, Kissi, in the Bronx instead? And that's what they proved over and over again. They declined to acknowledge it in any of the response briefs since this appeal has begun. But what they proved, not only through that, but through the corroborating testimony of their one and only cooperating witness, was that transactions like Kissi's, and like the ones that Baturi himself was involved in, were sometimes needed to fulfill that plan. Otherwise, for victims like Duffield, who just couldn't wire their money directly to Africa, how else would the court do it? And even if we put that testimony aside, even if there is some reason to just ignore Duffield's testimony and to ignore that aspect of Baturi's testimony, the government's argument is that the type that might have been accepted before Cuellar, in fact, was accepted in this circuit before Cuellar, the appellant in Ness, his conviction was initially affirmed by this court. But then after Cuellar, this court said, OK, the fact that he was moving money from one place to another in a secretive fashion, and he was trying to that doesn't mean, after Cuellar, that that was the purpose of his moving money from one place to another. At bottom, the whole purpose of that transaction was to pay the drug suppliers he was moving the money to. And one thing that I do think, even if we were in a pre-Cuellar world, distinguishes this case from the facts in the cases that we've cited, is that the government didn't submit anything to show that anybody who did know where this money was coming from even wanted to conceal an attribute of the money. And there's certainly nothing in the record to show that Kissy himself was aware of such a design and intended to further that plan using bank accounts he opened using his own name, contact information, Social Security. The government's response brief points out that when he withdrew funds, he presented them with his state-issued driver's license and signed his own true name. And so there's not even an inference or a good reason to speculate that he thought, OK, I'm going to use all these accounts where everything could be traced back to me as a way of concealing cash, good old untraceable cash that's deposited, in one case, in Port Jervis and then withdrawn from the same account in the Bronx. He's moving cash from one place to another, which would otherwise be untraceable, and he does it through an account where everything could be traced back to him. That's actually the opposite of trying to conceal an attribute or the source of the money. And with respect to Kissy's specific knowledge as to where the money came from, which is the second prong of the money laundering statute, as well as our challenges under accounts three and four, the receipt of stolen property counts, there's no dispute that Kissy never communicated with the romance scam victim. And the government called only two witnesses who claimed to have even spoken with Kissy before trial, and it avoided asking either of them questions relating to Kissy's knowledge of the source of the money. The government did repeatedly ask Vittori about conversations he had with three when you had a conversation about where the money you were sending back to Ghana came from. They asked him more or less that same question about three different people. Never asked him that question in relation to Kissy. So how was the government imputing specific knowledge about the source of these funds to him? Well, there was that TD Bank representative who testified that she talked to him about cash that had been deposited in one place and withdrawn from another. And it's worth emphasizing again that that account, like all of his accounts, had been opened using his own name and contact information. Because if he had known that the people sending money directly to his accounts were being scammed, their money was being stolen, that would be like him helping to steal a wallet and then leaving a calling card with his contact and banking information in its place. What do we do with this conversation with the TD Bank rep where he says, oh, no, that's money from my car business. So there's an example of even though he's using his name and things, concealing the source of the money. Does that help, I guess, the government get to concealment, designed to conceal? If we were in a pre-Cuellar world, it would. And the jury could rationally infer that he knowingly lied to that bank representative. They could have inferred the other way, but either way, I will concede that a jury could say, oh, he was lying to that bank representative. Just as the petitioner in Cuellar lied about where he was going and why he was, why he had the total itinerary of his trip, he repeatedly lied to the agents there. I believe it was also in Ness where the petitioner, I'm sorry, the appellant had lied to investigating agents. And what that shows is knowledge that he was involved maybe in something that was unlawful in and of itself. But as far as his specific knowledge was concerned, as to the funds, the evidence was equally consistent with a number of offenses, just as it was in Samaria and just as it was in the Lorenzo case we cite. And also in Your Honor's decision in the Bennett case, which we cite too. And the issue there, as the government points out, was the jury charges. Here it wasn't the jury charges, it was the sufficiency of the evidence that he specifically knew that it was being stolen from the people who were sending it to him, or with respect to money laundering count, that he specifically represented the proceeds of some other crime. Not that the transactions themselves were illegal, but if the simplest explanation is usually the correct one, then somebody in Kissy's position would most likely have thought that these people sending him money for him to transmit to Africa were probably paying for things that maybe they shouldn't be paying for. Or maybe that they were paying for legitimate things in a fashion that was itself suspicious or unlawful. Which is why they included false information in the transfer record they sent him. And why none of them ever complained to him, none of them ever complained to his banks about those transactions. And there was evidence that some of the people who sent Baturi money had complained to his banks, and that his accounts had been shut down because of that. But there's no evidence that Kissy ever learned that anybody who sent deposits either to him or to Baturi had complained about those deposits after the fact. No, the government also... Oh, I do not. I do not. Thank you. Good morning. May it please the court. My name is Catherine Riley, and I'm an Assistant United States Attorney here in the Southern District of New York. I represent the government on appeal as I did below. Your Honor, the evidence at trial was more than sufficient to sustain the jury's verdict on all of the guilty accounts 2, 3, and 4. And I'd like to begin by talking about the evidence that the transactions the defendant was involved in were in fact designed to conceal the nature and ownership of the proceeds of the fraud. The appellant talks a great deal about the notion that the bank accounts that the monies flowed through were in Mr. Kissy's name and used his true identity. But the evidence at trial was not that the goal was to design... the design here was to conceal Kissy's involvement. It was a design to conceal the ultimate owners of the fraud proceeds, the individuals in Ghana orchestrating the romance scams on the victims in the United States, and to conceal the nature of fraud by separating those victims who understood, of course, that they were sending money for very different purposes from the ultimate recipients of the funds in West Africa. The evidence at trial that that design was in fact in place and was something Mr. Kissy agreed to was manifold. First, of course, there was testimony from victims who indicated that they had no connection to Mr. Kissy, no reason to believe that he was going to be the ultimate recipient of the funds. There was a great deal of analysis of extensive bank records showing that Mr. Kissy opened numerous accounts, that those accounts were closed in large part because of the flow of funds, but that before they were closed, Mr. Kissy made large cash withdrawals almost immediately after victim funds flowed in or made immediate wire transfers out both internationally and within accounts. But I understand the argument to be, and I think this Cuiar issue is interesting, and I don't know if there's anything about transport money laundering from transaction money laundering that would change the analysis, right? So there's this notion that there's a difference between concealing to transport and transporting to conceal. And so to the extent that there are things like converting it to cash, to the extent that there's evidence that that might be necessary to get it to its analogous to concealing to transport rather than transporting to conceal. Certainly, Your Honor. I think first of all, there's no requirement under the statute that concealment be the only purpose of the transactions, only that it be an intended purpose. So transportation can be part of the analysis, but under QUELAR can't be the only purpose. Those cases, the line of cases flowing from QUELAR about transporting cash and hiding the cash, this is something quite different. It's not just taking cash out and then moving it abroad. It's having money come into an account that has ostensibly no connection to the stated purposes of the transfer of the funds. Some of those accounts held in fake names, not Mr. Kissy's accounts, but there was evidence at trial that he directed the flow of victim funds into the accounts of a co-conspirator, some of which were held in fake names. And then the withdrawal of that cash among numerous different people. There's also, of course, the lie to the TD bank representative to conceal why the proceeds are coming into Mr. Kissy's accounts. Taken together, what I think the evidence is more than sufficient to show, and especially when all inferences are drawn in favor of the government, as of course they must be here, the goal was not just to get otherwise. There were simply too many steps, too many efforts to attenuate the victims who had one understanding of why they were sending the funds from the recipients in West Africa who, of course, were perpetrating the scheme. There are too many different sort of operations in the movement to try to create distance that would conceal the ultimate owners and source. It's different in that way than just putting cash in a box and driving it across the border. So ultimately taking all of that together and, of course, reading the evidence in the light most favorable to the government, there was sufficient evidence for the jury to conclude that the purpose here was to conceal and that Mr. Kissy, who's not only engaging in transactions in his own account, but who's directly communicating with a co-conspirator about victim funds, about accounts in false names, about the transfer of cash, knew that the purpose was to conceal. I want to... Conceal what? I mean, it sounds like you're saying that it's enough to show intent to conceal by adding a step of in the chain, you know, creating distance between the victims and the ultimate perpetrators. So here, Your Honor, I believe the goal was to conceal the ownership of the source of the funds, the ultimate recipients in Ghana orchestrating the scam, as well as the nature of the funds. The fact that this was ultimately a fraud and these are fraud proceeds, the victims, of course, believed they were sending money for very different reasons. And part of what helped to effectuate that belief was the story they were told about what Mr. Kissy's account or his co-conspirators accounts were supposed to do. In one case, he was supposed to be a relative. If there was another step or somebody else just to create one more step of attenuation, would that also be enough to establish an intent to conceal? I think that the precedents here suggest that any effort to sort of attenuate may well be sufficient, but of course, it's a very fact-determined inquiry. And so on the facts here and the evidence here, we can see that there were multiple steps and communications among co-conspirators about how to achieve this goal as to the victims who testified at trial and other victims whose funds were the source of discussion at trial. I want to quickly move with the court's permission to... Of course, Your Honor. In the legal analysis, you know, they've got these two different concealing to transport, transport, conceal. Is it enough that some slight component of the reason, if it's a mixed motive situation, and maybe they're doing this stuff mostly because they need to get the money to the perpetrators and that requires various steps because it's not that straightforward, but they may also subjectively hope that that puts the distance. Is that enough? Does it have to be the primary motive, a substantial motive? What's the legal test? I believe under the statute, as long as the evidence is sufficient to find that it was the intent of those engaged in the conduct to conceal, even if it was an intent among others, that that is sufficient, Your Honor, to sustain the conviction. Thank you. I want to quickly touch on this notion of Mr. Kissi's specific knowledge that these funds were illegal proceeds or were stolen, and in particular, to touch on a piece of the record that appellant leaves undiscussed in his analysis, and that is the testimony of the cooperating witness, Mubarak Batori, about specific conversations he had with the defendant in which they used the term fraud boys to discuss the individuals in Ghana who were a middleman. That discussion is at page 186 of the appendix. Mr. Batori recounted at trial a specific conversation he had with Mr. Kissi using the term fraud boys. He, of course, testified extensively furthermore that they used the term boys interchangeably with fraud boys, that everyone understood that who was involved in the scheme to mean those who were perpetrating the romance scams in West Africa. That testimony, particularly when taken in conjunction with Mr. Batori's communications with Kissi, in which they discuss withdrawals of cash, meetings to transfer that cash, victim deposits into accounts in fake names, some of those victim deposits matching up to the testimony of victims at trial, taken all together, that testimony from Mr. Batori and the accompanying communications is more than sufficient evidence to sustain the notion that Mr. Kissi understood that these were illegal proceeds, stolen proceeds, that he was directing through Mr. Batori's accounts. And, of course, that evidence is taken with the further evidence regarding Mr. Kissi's own accounts and his lies to the bank representative about where those monies came from. So the mixed evidence about his accounts, how he moved money out of them, the fact that the people sending money to him had no connection to him or his stipulated legitimate employment, and then Mr. Batori's testimony about their discussions about fraud, more than sufficient to sustain the jury's verdict and the basis that Mr. Kissi did have specific knowledge of the illegal proceeds. Unless the court has any further questions, I'll rest on my brief. Thank you, counsel. Mr. Anderson, you're reserved two minutes for a vote. Thank you, your honors. The government still has not acknowledged the direct examination testimony they intentionally elicited from their one and only cooperating witness and from one of the victims they called to the stand. Mubarak Batori, they asked him, why was it that sometimes the scam perpetrators in Ghana needed people in the United States to receive money? And he said there was no way the victims could send money to Africa because it would be blocked, they would get red accounts. These were not unnecessary steps. There were sometimes transactions where in order to get money from these people in the United States to the people who were perpetrating these scams in Ghana, transactions like the one Kissi was involved in were necessary to fulfill that plan, and that was corroborated by the testimony from Duffield we presented earlier. The government still has not acknowledged either of those. It's the notion though, I mean it's interesting when you read that testimony that says to me that it would be blocked because of they'd want to investigate further to see if this was a fraudulent situation, and so in order to avoid that you do this other process. Isn't that fully consistent with the notion that the indirect route is the concealment that you need to avoid the transparency of the direct route which is going to get shut down both as a matter of expediency but also as a matter of disclosing the fraud? No, because that gets back to how the transactions were conducted instead of why they were conducted. It's analogous to somebody shipping money in a secret compartment in their car and wrapping it in duct tape and putting animal hair on it as in Cuellar. He's doing these secretive things in order to get the money from one place to the other, but why were they getting money from one place to the other here? That is the critical question here. The government answered it through the testimony they elicited at trial. With respect to the fact that the cases that we cite, the binding cases, mostly involve transportation of cash rather than bank transactions, well the Eibar-Peguero case, this court's decision just from last July, involved somebody depositing unlawfully gotten proceeds into his bank account, intermingling it with funds that he had obtained lawfully, and so that, there you show, oh he's trying to conceal these funds, but because he didn't in his plea colloquy say that was the reason that I deposited that money. The reason I did that was because I was was not sufficient under Rule 11. And then before my time runs out, I do want to address what the government said about the testimony that Battori presented saying that he liked to use the term fraud boys when he referred to the people in Africa they were sending money for. In their closing statements, they presented 10 reasons why you know Kissy knew what was happening, and they didn't raise this fraud boys thing because it has an element of grasping at straws. It was the government itself who first put that phrase into Kissy's mouth, and that's on the bottom of pages 175 to the top of 176 of the transcript. They were the ones who, through their questioning of Battori, first suggested that Kissy had used the term boys or fraud boys. At one point, Battori did say, with the government's side on page 186, that Kissy had said to him, well I'll get in touch with the fraud boys, but they didn't follow up with any questioning, as they would have if they thought they would get a good answer to determine whether Kissy, if that was the language that he used, and not just Battori's summary of that language at trial, whether he seemed to attribute the very same specific meaning to it, or if he used it just because Battori did. If there are no further questions from the court, we ask that the Council of Convention be reversed and that the motion for bail be granted. Thank you, counsel. Thank you both. We'll take the case under advisory.